419 F.2d 314
 70 L.R.R.M. (BNA) 3047, 136 U.S.App.D.C. 12
 OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL
425, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Brotherhood of
Locomotive Firemen and Enginemen, Intervenor.
BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Office and
Professional Employees International Union, Local
425, AFL-CIO, Intervenor.
 Nos. 21550, 21710.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 25, 1968.
Decided March 19, 1969.
 
 Mr. Joseph E. Finley, Cleveland, Ohio, with whom Mr. Melvin S. Schwarzwald, Cleveland, Ohio, was on the brief, for petitioner in No. 21,550, also entered appearances for intervenor in No. 21,710.
 Mr. Leonard F. Lybarger, Cleveland, Ohio, for petitioner in No. 21,710, Mr. William J. Hickey, Washington, D.C., was on the brief for petitioner in No. 21,710 and also entered an appearance for intervenor in No. 21,550.
 Mrs. Abigail Cooley Baskir, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel and Glen M. Bendi sen, Atty., National Labor Relations Board, were on the brief, for respondent.
 Before BURGER, MCGOWAN and LEVENTHAL, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This case is before us on a petition to review and set aside a National Labor Relations Board (NLRB) order filed by the Employer (which in this case happens to be a union, the Brotherhood of Locomotive Firemen & Enginemen), a petition for modification filed by the Union (Office & Professional Employees International, Local 452, AFL-CIO), and a cross-petition for enforcement filed by the NLRB. Finding substantial evidence in the record supporting the findings of fact and no error in the application of law, we deny both the petitions to reverse and to modify the order, and we grant enforcement.
 
 
 2
 The Employer, Brotherhood, is a labor organization representing railroad employees throughout the United States and Canada. Its central office, the Grand Lodge, is located in Lakewood, Ohio, and it has approximately 1,200 local units whose operations are occasionally audited by The Grand Lodge. The Grand Lodge is the unit involved in this case. For several years prior to 1966, while the employees in this unit were represented by the Grand Lodge Employees Association, nearly all auditing work was done by certain chosen employees taken from within this bargaining unit. Following an election in August 1966, appellant Union was certified as the new bargaining representative for the employees of this unit.
 
 
 3
 On September 8, 1966, contract negotiations between the Employer and Union began. The Employer proposed that three classifications-- Programmer, Insurance Underwriting Supervisor, and Auditors-- be exempted from the bargaining unit. The final collective bargaining agreement, dated October 1, 1966, makes no mention of auditors or exemptions thereof, but provides that employees performing the work customarily done by the statistical clerks outside of the central office would receive no less than the rate of statistical clerk.
 
 
 4
 Toward the end of October, the Employer, without notifying or consulting with the Union, made plans to have the auditing work done outside the Union. It checked with employees to ascertain who would be willing to accept assignments as full-time auditors. Effective November 1, 1966, it granted two volunteer office employees of the unit a one year leave of absence from the unit and appointed them in its new (as of 1966) classification of General Organizer-Auditors, to perform audits full time. The Union protested and stated that it was invoking the grievance procedure. On November 25, the Union advised the Employer that it would like to suspend the grievance proceedings pending resolution of an unfair labor practice charge being prepared by the Union. The Employer answered on November 29 that if the Union had a grievance at all, the time for processing it had expired under the grievance procedure. The Union filed charges against the Employer on December 1.
 
 
 5
 The NLRB adopted the Trial Examiner's findings that the Employer had violated Section 8(a)(1) and (5) of the National Labor Relations Act (the Act)[1] by unilaterally changing the terms and conditions of employment without fulfilling its duty to bargain. It ordered the Employer to cease and desist from its unlawful action and to restore the status quo ante by rescinding the new classification and returning the two employees to their former classification in the unit.
 
 
 6
 The Employer seeks seversal of the Board's order on three grounds: First, the NLRB abused its discretion by asserting jurisdiction instead of deferring to the mandatory grievance procedure; Second, the merits were improperly decided by the Board; and Third, the remedy is improper. The Union seeks to extend the remedy so that the order would (1) prohibit any change of the auditing work during the term of the contract without Union agreement; and (2) require reimbursement of the Union for dues lost. We discuss these contentions in the order listed.
 
 
 7
 I. NLRB'S FAILURE TO DEFER TO ARBITRATION IS NOT ABUSE OF DISCRETION.
 
 
 8
 The Employer does not question the statutory jurisdiction of the Board over this case,[2] but rather asserts that under the circumstances the NLRB should have deferred to arbitration. The Employer contends that the Supreme Court's decisions in Textile Workers v. Lincoln Mills[3] and the Steelworkers' Trilogy,[4] express a philosophy which the NLRB must implement, of strengthening collective bargaining by giving full play to private adjustment machinery established by the parties, and that it is inconsistent with the statutory policy favoring arbitration for the Board to resolve disputes which, while cast as unfair practices, essentially involve a dispute as to interpretation or application of the collective bargaining agreement.[5]
 
 
 9
 The Supreme Court's decisions in Textile Workers and the Steelworkers' Trilogy do, indeed, laud the policy of respecting arbitration agreements reached by the parties. But as the Court pointed out in NLRB v. Acme Industrial Co., 385 U.S. 432, 436, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), these earlier decisions 'dealt with the relationship of courts to arbitrators. The weighing of the arbitrator's greater institutional competency, which was so vital to those decisions, must be evaluated in that context. * * * The relationship of the Board to the arbitration process is of a quite different order. See Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 269-272, 84 S.Ct. 401, 11 L.Ed.2d 320' (1964).
 
 
 10
 The Board's basic jurisdiction in the premises has recently been confirmed by the Supreme Court. See NLRB v. Strong, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (Jan. 15, 1969):
 
 
 11
 Admittedly, the Board has no plenary authority to administer and enforce collective bargaining contracts. Those agreements are normally enforced as agreed upn by the parties, usually through grievance and arbitration procedures, and ultimately by the courts. But the business of the Board, among other things, is to adjudicate and remedy unfair labor practices. Its authority to do so is not 'affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *.' 10(a), 61 Stat. 146, 29 U.S.C. 160(a). Hence, it has been made clear that in some circumstances the authority of the Board and the law of the contract are overlapping, concurrent regimes, neither rpe-empting the other. NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967); Carey v. Westinghouse Electric Corp., 375 U.S. 261, 268, 84 S.Ct. 401, 407, 11 L.Ed.2d 320 (1964); Smith v. Evening News Ass'n, 371 U.S. 195, 197-198, 83 S.Ct. 267, 268-269, 9 L.Ed.2d 246 (1962); Local 174, Teamsters, etc. v. Lucas Flour Co., 369 U.S. 95, 101, n. 9, 82 S.Ct. 571, 7 L.Ed.2d 593 (1961). Arbitrators and courts are still the principal sources of contract interpretation, but the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract remediable as such by arbitration and in the courts. Smith v. Evening News Ass'n, 371 U.S. 195, 197-198, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). It may also, if necessary to adjudicate an unfair labor practice, interpret and give effect to the terms of a collective bargaining contract. NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).
 
 
 12
 In Carey v. Westinghouse Elec. Corp., 375 U.S. 261, at 271, 84 S.Ct., at 409 (1964), referred to with approval in Strong and Acme the Court quoted a then recent statement of the Board (see International Harvester Co., 138 N.L.R.B. 923, 925-926 (1962), aff'd, Ramsey v. NLRB, 327 F.2d 784 (7th Cir. 1964), cert. denied, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964):
 
 
 13
 There is no question that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award. Section 10(a) of the Act expressly makes this plain, and the courts have uniformly so held. However, it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.
 
 
 14
 We might leave the matter there and say that since the Board has some discretion to take jurisdiction rather than to defer to arbitration, the Employer's objection to exercise of discretion cannot be based on a legal broadside, but can be supported only by some showing that the Board has shown a lack of even-handedness in its action, or has otherwise been arbitrary or capricious-- a showing that has not been attempted by appellant Employer.
 
 
 15
 We have, however, explored the matter further, at argument and in our own research, to satisfy ourselves that there is at least a likelihood that the Board is following a tolerable approach in its determination whether to accept jurisdiction or to defer to arbitration.
 
 
 16
 Here the Trial Examiner disposed of the matter of the Board's jurisdiction rather summarily, saying that since the Employer advised the Union that the time for processing the grievance under the grievance procedure had expired the Employer was 'estopped' from asking the Board to decline jurisdiction.
 
 
 17
 If this use of an 'estoppel' concept were taken literally, it would not be without problems. But the question may be bypassed, for even assuming it is not an estoppel, the Employer's position, denying availability of arbitration, is certainly a significant circumstance for the Board to consider. And while the Board generally adopted the Examiner's decision it did insert its own wording on the abstention issue saying: 'We do not agree with the respondent that, in the circumstances of this case, the Board should in the exercise of its discretion decline to assert jurisdiction herein in favor of arbitration.'
 
 
 18
 A curious situation greets us. The Union's counsel did bring out in oral argument that the unions do not know when the Board will or will not abstain from exercising jurisdiction in favor of arbitration. But the employer protesting the exercise of jurisdiction did not attack the decision on the ground that the Board failed to indicate its reasoning. Even assuming a court may to some extent review a Board's failure to abstain, it may be doubted whether the general doctrine requiring findings as a predicate for a showing of sound exercise of discretion applies with full vigor when what is involved is not a ruling on the merits but a determination to exercise jurisdiction. The broadside contention of the Employer, at least as made to us, did not require any detail in the Board's decision.
 
 
 19
 To ascertain the Board's approach on this vexing question, whether to exercise jurisdiction or to defer to arbitration, might require a canvass of both its formal decisions and the actions of its regional offices, where the initial decision on processing an unfair labor practice charge is made. We have not made an independent canvass but have referred to responsible secondary sources and are told that the regional offices generally encourage the use of arbitration to settle matters whenever possible.[6] There is nothing before us to indicate abuses at this regional level.
 
 
 20
 We turn now to the Board's decisions. By the time the Board considers a case a complaint has been issued, a hearing held, and a trial examiner's decision completed. These facts, plus the delay in ultimate decision already entailed, obviously complicate the problem of deferring to arbitration.
 
 
 21
 Without undertaking exhaustive research we have gained some knowledge of the Board's approach from the responsible secondary sources, together with some confirmatory reference to Board precedents there cited. From these sources a pattern of rulings is discernible, though perhaps not with euclidean clarity.
 
 
 22
 It appears that the Board defers to arbitration under its doctrine of Spielberg Mfg. Co., 112 N.L.R.B. 1080 (1955), when the arbitrator's award has already issued, there is no reason to believe the arbitration decision was not fair and regular, all parties have agreed to be bound, and it is not clearly repugnant to the policies of the Act. See also Carey v. Westinghouse Elec. Corp., 375 U.S. 261, at 270-271, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964).
 
 
 23
 Where arbitration has not been completed, and certainly where arbitration has not even been begun, different considerations are referred to, at least in 8(a) (5) cases, as prompting the Board to defer to arbitration. One is willingness to arbitrate. Another is the existence of an unfair labor practice that 'turns primarily on an interpretation of specific contractual provisions, unquestionably encompassed by the contract's arbitration provisions, and coming to us in a context that makes it reasonably probable that arbitration settlement of the contract dispute would also put at rest the unfair labor practice controversy in a manner sufficient to effectuate the policies of the Act.'[7] The Board has dismissed complaints where the contract clearly covers the dispute and there was nothing blocking arbitration.[8] However, the Board has asserted its jurisdiction without awaiting arbitration in situations characterized by the following factors, or some combination thereof: (1) one or both parties fail or are unwilling to go to arbitration;[9] (2) the purported contract defense-- either under management rights or union waiver-- is considered palpably without merit or a sham raised in bad faith;[10] (3) arbitration is not likely to be of benefit-- either because there is nothing in the contract providing a defense or touching the matter, or because the dispute is not arbitrable under the contract.[11]
 
 
 24
 There have been some differences among the Board members on the standards for deferring in the marginal area of possible contract settlement. Member Brown,[12] joined at least once by Member Zagoria,[13] has argued for greater deference in cases where the contract is likely to settle the matter, even if this is not certain and even if the union may have ignored or abandoned the arbitration route in preference to the Board.
 
 
 25
 It is not the province of the court to supervise the Board in terms of sound economy of administration, or to say whether we think it wise for an over-worked Board to exercise jurisdiction to the extent indicated. It suffices for purposes of this case and the contention before us to say that we have no basis for concluding that the Board is sailing without any rudder, or is charting a course too far out to sea.
 
 
 26
 The Board has attempted to further the statutory objective by deferring to arbitration in certain instances where that is deemed likely to promote industrial peace. And the instances where it has declined to defer its jurisdiction are instances where it believes that the arbitration route will not be conducive to the statutory objective, for one reason or another. We do not pursue the matter in any greater detail, being satisfied at least that there is no warrant for judicial interposition in the matter before us, where there is a substantial possibility if not probability that the abstention doctrine would not have led to resolution of a dispute by an arbitrator.
 
 
 27
 On the facts of this case we could not upset the Board's assertion of its jurisdiction even assuming applicability of the narrower standard suggested by Member Brown. Indeed the Board's panel happened to consist of Chairman McCulloch and Members Brown and Zagoria, and there was no dissent. This controversy was not clearly a mere question of contract interpretation. The final contract did not mention auditing.[14] Also, it was unclear whether the time for arbitration had not passed. Under the Board's approach these factors militate against deferring to arbitration.
 
 
 28
 We repeat, for emphasis, that this opinion is not intended as a determination one way or another on the Board's general abstention approach. We merely rule that the particular contention and record before us do not warrant reversal of its order.
 
 
 29
 II. SUBSTANTIALITY OF THE EVIDENCE.
 
 
 30
 We find substantial evidence to uphold the findings of the NLRB, which adopted the findings of the Trial Examiner, that the Employer unilaterally changed the terms and conditions of employment without fulfilling its statutory duty to bargain. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, 6 A.L.R.3d 1130 (1964).
 
 
 31
 Past practice clearly established as a term and condition of employment that members of the unit were selected to perform audits when necessary. Fibreboard Paper Products Corp. v. NLRB, supra, 379 U.S. at 210, 85 S.Ct. 398, 13 L.Ed.2d 233, 6 A.L.R.3d 1130. Uncontradicted evidence showed that from 1962 to 1966, almost all of the 90 audits performed were done by selected unit employees. In 1966, when the Employer wished to exclude auditors from the unit, the Union bargained on the matter; the exceptions were mentioned at every meeting between September 8 and September 20, and discussed at length on at least two days of negotiations. Nothing from these discussions resulted in any contract provision referring to auditors or auditing. (See n. 14 supra.)
 
 
 32
 There is no evidence that the Union waived its bargaining rights on this matter; in fact, the Union President said that he would prefer to have the work farmed out than to have any more exempt positions. Waiver of bargaining rights must be clear and unmistakable,[15] and contract silence without more is not sufficient to establish waiver.[16] Finally, there is substantial evidence to uphold the finding that no impasse had been reached on the matter of an auditor exemption, but rather the matter was withdrawn by the Employer in arriving at the final written collective bargaining agreement. Faced with conflicting testimony over whether the proposed exemption was withdrawn in final negotiations in an exchange concession, or merely dropped, the Trial Examiner and Board chose to give credence to the Union. We cannot say this overstepped the bounds of reason and therefore requires reversal.[17] Thus, we reject the Employer's contention on appeal that the Union refused to bargain, an impasse was reached, and the Employer could thereafter act unilaterally without violating the Act.
 
 
 33
 The Employer also contends that its action had no significant detriment on the bargaining unit and was authorized under Kennecott Copper Corp., 148 N.L.R.B. 1653 (1964) and Westinghouse Elec. Corp. (Mansfield Plant), 150 N.L.R.B. 1574 (1965). The short answer is that the Examiner did find detriment, though admitting that the adverse consequences were not as obvious as in other cases. The Union lost an element of work carrying higher pay and opportunity for experience and advancement; and it received no guarantee that future auditors would be taken from the unit. The Employer offers nothing to dispute the correctness of these conclusions.
 
 
 34
 III. VALIDITY OF THE BOARD'S REMEDY.
 
 
 35
 In 10(c) of the Act Congress has given the Board broad power to fashion remedies to effectuate the policies of the Labor Act.[18] So long as the Board exercises responsibility in its judgment, courts should not interfere with its remedy, since this is 'peculiarly a matter for administrative competence.' Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, at 194, 61 S.Ct. 845, at 852, 85 L.Ed. 1271, 133 A.L.R. 1217 (1941).
 
 
 36
 The Board's function is to provide an order 'designed to promote the policies of the Act.'[19] This comprehends orders intended to 'dissipate the unwholesome effects of violations of the Act,'[20] and to restore the situation, as nearly as possible, to what would have obtained but for these violations.[21] The order must stand unless there is a showing that the 'order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).
 
 
 37
 Even where the order has an impact on interests protected by the Act, it must be affirmed so long as the Board, in its reconciliation of interests, adopts a remedy reasonably calculated to effectuate the policies of the Act. United Steelworkers, AFL-CIO (Northwest Engineering Co.) v. NLRB, 126 U.S.App.D.C. 215, 218, 376 F.2d 770, 773, cert. denied, 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285 (1967). These standards lead us to affirm the order under review.
 
 
 38
 A. Restoration of the Status Quo Ante.
 
 
 39
 The Board ordered an end to the new classification of full-time auditors outside of the Union's work unit and restoration of the two employees to their former classification in the unit. The Employer argues that this will cause the adverse consequences of demoting two employees and possibly discharging another. We are not clear why the Board's order of reclassification must necessarily result in lowering of wages and benefits, or in the discharge of any employee.[22] Even assuming that such is the result, we do not feel this is sufficient under the circumstances to warrant alteration of the Board's order. To overcome the effects of the unlawful act of the Employer, the Board seeks to promote the policies of the Act by restoring the status quo ante. See Fibreboard Paper Products Corp. v. NLRB, supra, 379 U.S. at 216-217, 85 S.Ct. 398, 13 L.Ed.2d 233, 6 A.L.R.3d 1130. The fact that certain employees may have benefited from the violation of the Act, does not undercut the Board's power to restore pre-violation conditions, for it is public, not private, rights that are being vindicated. Virginia Elec. & Power Co. v. NLRB, supra, 319 U.S. at 543, 63 S.Ct. 1214, 87 L.Ed. 1568.
 
 
 40
 B. Board's Refusal to Require Agreement Before Future Change.
 
 
 41
 The Union argues that the Board did not go far enough in its decision merely requiring notice and bargaining over performance of the auditing work. The Union cites C & S Industries, 158 N.L.R.B. 454 (1966), in support of its position that the Board should have required Union agreement before any change of the auditing work during the contract term. In C & S Industries, after signing a bargaining agreement, the Employer unilaterally and without bargaining instigated an incentive wage plan. The Board found an 8(a)(5) violation and ordered the Employer to cease and desist from its act and refusal to bargain regarding the incentive plan, and further ordered it not to change the wage plan before the end of the contract term without the Union's approval. But in C & S Industries there was a specific contract provision establishing the wage plan.[23]
 
 Section 8(d) of the Act provides:
 
 42
 Where there is in effect a collective-bargaining contract * * * the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party * * * (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later: * * * The duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.
 
 
 43
 Section 8(d) of the Act therefore operated to put the Employer in a position wherein he could not unilaterally alter the contract wage provision during the contract term without violating 8(d) and 8(a)(5). The Act intended this result since it fosters industrial peace; where the parties have bargained to agreement on a matter and have included it in their contract for a specified term, they should not be forced to bargain anew at the whim of the other party or face unilateral change.
 
 
 44
 In our situation, unlike C & S Industries, we do not have a Board finding that the employer modified a term and condition contained in an existing contract for a fixed period. There is no provision in the agreement expressly referring to auditing.
 
 What the Examiner and Board held was:
 
 45
 * * * I find that the parties have by unmistakable implication proceeded on the premise that the past practice of performing audits through the part time use of unit employees was to be continued for the term of the contract. Essentially then, when the Respondent, subsequent to the execution of the agreement and soon after its term began, took the unilateral action complained of herein, it in effect sought to and did modify during the life of the existing contract terms and condition of employment of the employees within the unit. C & S Industries, Inc., 158 NLRB No. 43; Anaconda Aluminum Company, 160 NLRB No. 7.
 
 
 46
 There is an ambiance here of implied understanding. However, the Board's decision, attentively read, does not find that the Employer violated the terms and conditions of a contract, but only that he changed the terms and conditions of employment, and that is a different, matter. There is a duty to bargain about terms and conditions of employment even during the life of an agreement provided there is no unilateral modification of 'the terms and conditions of the existing contract.'
 
 
 47
 The Union apparently would have us require the Board to interpret the contract in light of past practices and bargaining history to find some implied contractual condition that the auditing be performed in the unit. To find a violation of the Act, the contract need only be considered to the extent of ascertaining there was no provision justifying the unilateral change of the terms and conditions of employment without bargaining. It was unnecessary to go beyond the express terms to find a violation of contract duty imposed by implied terms and conditions.
 
 
 48
 We are not called upon to consider in what circumstances or to what extent the Board may predicate a conclusion of violation of the duty of collective bargaining set forth in 8(d) upon a finding of change of an implied term of a contract.[24] It is enough for present purposes that the Board did not make such a finding in this case, and that it was not required to do so before concluding that this employer violated its statutory duty by making unilateral changes in terms and conditions of employment without prior bargaining.
 
 
 49
 C. Reimbursement of Union for Dues.
 
 
 50
 The Union contends the Board erred in failing to order reimbursement of the Union for lost dues. Apparently the Union is not claiming dues were lost from the two employees who became full-time auditors, but rather that if the increased auditing work had been done inside the unit, the Employer would have had to expand the unit by two persons who would pay dues. We have already noted the Board's broad discretion in the framing of remedies to foster the objectives of the Act. We cannot say the Board exceeded its powers.
 
 
 51
 The petitions to reverse and modify the order are denied, and the order will be enforced.
 
 
 52
 So ordered.
 
 
 
 [1]
 29 U.S.C. 141 et seq. (1964). All section numbers refer to this Act
 
 
 [2]
 NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967), and NLRB v. Acme Indus. Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), have been read as affirming Board jurisdiction even in cases where there is a mandatory and binding arbitration clause. See, e.g., NLRB v. Huttig Sash & Door Co., 377 F.2d 964 (8th Cir. 1967), and NLRB v. Scam Instrument Corp., 394 F.2d 884 (7th Cir. 1968), cert. denied, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441 (Dec. 9, 1968)
 
 
 [3]
 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)
 
 
 [4]
 United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [5]
 Employer directs us particularly to the analysis of Board Member Brown in his concurring opinion in Cloverleaf Div. of Adams Dairy Co., 147 N.L.R.B. 1410, 1421 (1964)
 
 
 [6]
 See, e.g., Ordman, The Arbitrator and the NLRB, THE ARBITRATOR, THE NLRB, AND THE COURTS, PROCEEDINGS OF THE TWENTIETH ANNUAL MEETING NATIONAL ACADEMY OF ARBITRATORS, 47 at 55-56 (1967). Other commentators also mention this, at 78 and 181-182
 
 
 [7]
 Cloverleaf Div. of Adams Dairy Co., 147 N.L.R.B. 1410, 1416 (1964); see also C & S Industries, 158 N.L.R.B. 454, 459-460 (1966); Puerto Rico Tel. Co., 149 N.L.R.B. 950, 967-968 (1964), modified Puerto Rico Tel. Co. v. NLRB, 359 F.2d 983 (1st Cir. 1966)
 
 
 [8]
 Vockers, Inc., 153 N.L.R.B. 561 (1965); Flintkote Co., 149 N.L.R.B. 1561 (1964); Bemis Bros. Bag Co., 143 N.L.R.B. 1311 (1963); Montgomery Ward & Co., 137 N.L.R.B. 418 (1962); see also La Roy Mach. Co., 147 N.L.R.B. 1431 (1964)
 
 
 [9]
 See, e.g., Scam Instrument Corp., 163 N.L.R.B. #39 (March 12, 1967), at 11, enforced, 394 F.2d 884 (7th Cir. 1968), cert. denied, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441 (Dec. 9, 1968); Huttig Sash & Door Co., 154 N.L.R.B. 811, 813 (1965), enforced, 377 F.2d 964 (8th Cir. 1967); Puerto Rico Tel. Co., supra note 7, 359 F.2d at 967. See also PPG Industries, 172 N.L.R.B. #61, at 10-11 (July 3, 1968); C & S Industries, 158 N.L.R.B. 454, 460 (1966)
 
 
 [10]
 See, e.g., Century Papers, 155 N.L.R.B. 358, 361 (1965); Hutting Sash & Door Co., supra note 9, at 816-817; Smith Cabinet Mfg. Co., 147 N.L.R.B. 1506, 1508 (1964)
 
 
 [11]
 See, e.g., Scam Instrument Corp., supra note 9, at 9; PPG Industries, supra note 9, at 11; Govenslund Opr. Co., 168 N.L.R.B. #72, at 4 (Dec. 1, 1967); American Fire Apparatus Co., 160 N.L.R.B. 1318, 1323, enforced, 380 F.2d 1005 (8th Cir. 1967); Adelson, Inc., 163 N.L.R.B. #53, at 5 (March 17, 1967); W. P. Ihrie & Sons, 165 N.L.R.B. #2, at 5 (June 5, 1967); C & S Industries, supra note 9, at 460; Cloverleaf Div. of Adams Dairy, supra note 7, at 1415-1417
 
 
 [12]
 Univis, Inc., 169 N.L.R.B. #18 (Jan. 12, 1968); Unit Drop Forge Div. Eaton Yale & Towne, Inc., 171 N.L.R.B. #73 (May 24, 1968); Cloverleaf Div. of Adams Dairy Co., supra note 7
 
 
 [13]
 Unit Drop Forge Div. Eaton Yale & Towne, Inc., supra note 12
 
 
 [14]
 The only related matter was the payment of at least the statistical clerk rate for work done outside of the Grand Lodge. This term did, however, follow a much earlier (July 26, 1966) employee proposal which, had it not been rejected, would have given at least the statistical clerk rate to those 'assigned to audit.'
 
 
 [15]
 International Union, United Auto., Aerospace and Agricultural Implements Workers of America (General Motors) v. NLRB, 127 U.S.App.D.C. 97, 381 F.2d 265, cert. denied, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967)
 
 
 [16]
 International Tel. & Tel. Corp. v. NLRB, 382 F.2d 366, at 373 (3d Cir. 1967), cert. denied, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1967)
 
 
 [17]
 NLRB v. Universal Packaging Corp., 361 F.2d 384, at 388 (1st Cir. 1966)
 
 
 [18]
 NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed.2d 377 (1953)
 
 
 [19]
 Fibreboard Paper Products Corp. v. NLRB, supra, 379 U.S. at 216, 85 S.Ct. at 406, 13 L.Ed.2d 233, 6 A.L.R.3d 1130
 
 
 [20]
 Franks Bros. Co. v. NLRB, 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944)
 
 
 [21]
 Phelps-Dodge Corp. v. NLRB, supra, 313 U.S. at 194, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217
 
 
 [22]
 Perhaps the Union, after bargaining, will agree to a new classification-- provided the employees stay within the unit
 
 
 [23]
 The contract in C & S Industries also specifically said that there would be no change of payment without negotiation and Union consent
 
 
 [24]
 It would be a nice question whether C & S Industries, supra note 7, rests on a finding of violation of an express or implied provision of the agreement