789 F.2d 9
 122 L.R.R.M. (BNA) 2139, 252 U.S.App.D.C. 177,
104 Lab.Cas. P 11,881
 ROAD SPRINKLER FITTERS LOCAL UNION NO. 669, UNITED
ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the
PLUMBING AND PIPEFITTING INDUSTRY OF the
UNITED STATES AND CANADA,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
A-1 FIRE PROTECTION, INC. and Corcoran Automatic Sprinklers,
Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Road Sprinkler Fitters Local 669, United Association of
Journeymen and Apprentices of the Plumbing and
Pipefitting Industry, Intervenor.
 Nos. 84-1622, 85-1002.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 23, 1986.
Decided April 22, 1986.
 
 Petitions for Review of an Order of the National Labor relations board.
 Hiran S. Grossman, Flint, Mich., for petitioners, A-1 Fire Protection, Inc., et al. in No. 85-1002.
 William W. Osborne, Jr., Washington, D.C., for petitioner, Road Sprinkler Fitters Local Union No. 669, in No. 84-1622 and as intervenor in No. 85-1002.
 Karen J. Ward, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for respondent in Nos. 84-1622 and 85-1002.
 Before EDWARDS and GINSBURG, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case involves a determination by the National Labor Relations Board ("the Board") that two affiliated employers, A-1 Fire Protection, Inc. ("A-1"), which is nonunion, and Corcoran Automatic Sprinklers, Inc. ("CAS"), which is unionized, violated section 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("the Act")[1] by diverting bargaining unit work from unionized CAS to nonunion A-1 without notifying or bargaining with the Road Sprinkler Fitters Local Union No. 669 ("the Union"). To remedy this violation, the Board ordered George Corcoran--the owner of both A-1 and CAS--to restore the status quo ante by resuming his bidding for CAS jobs in the same manner as he had bid for CAS jobs prior to his unlawful diversion of bargaining unit work. The Board ordered Corcoran to make whole any former CAS employees, but declined to order their reinstatement and further determined that the extension of the CAS collective-bargaining agreement to A-1 was inappropriate.
 
 
 2
 This case comes to this court on cross-petitions for review of the Board's decision filed by the Union and employers CAS and A-1, and on a petition for enforcement filed by the Board. CAS and A-1 urge this court to reverse the Board's determination of an unfair labor practice as unsupported by substantial evidence. The Union, on the other hand, argues that the Board's remedy is inadequate, and specifically challenges the Board's failure to require A-1 to comply with the CAS collective-bargaining agreement and the Board's decision not to order the reinstatement of former CAS employees.
 
 
 3
 We affirm the Board's decision in full. Its finding that Corcoran diverted bargaining unit work from CAS to A-1 is clearly supported by substantial evidence, and the extension of the CAS collective-bargaining agreement to A-1 is not necessary in light of the remedy imposed in this case. Once A-1 returns to its status quo ante activities, it will be a different bargaining unit than CAS, and contract extension would be neither appropriate nor necessary.
 
 I. BACKGROUND
 
 4
 In 1973, George Corcoran incorporated CAS and A-1 as two separate automatic sprinkler installment companies. Corcoran intended to operate CAS as a union company and A-1 as a nonunion company in a double-breasted operation.[2] On August 2, 1973, CAS and the Union entered into a collective-bargaining agreement.
 
 
 5
 Until 1975, A-1's business was limited to inspections and small installation jobs, and A-1 employed no sprinkler fitters other than Corcoran and his son. In contrast, CAS was operated as a major automatic sprinkler system installation firm that employed seven to ten sprinkler fitters, and its business included mostly large installation jobs. Beginning in 1975, however, Corcoran changed the operation of both CAS and A-1. He increased the number of sprinkler fitters employed by A-1 from two in 1974 to seven in 1975, and began to bid for several large installation jobs on behalf of A-1. CAS, on the other hand, experienced a precipitous decline in both the number and size of installation jobs. In 1976, CAS won only three installation bids--all much smaller than those of 1974 and 1975--and employed only three sprinkler fitters.
 
 
 6
 The Union became concerned about the growth of A-1's business in the fall of 1975. A Union member responded, at the Union's urging, to an advertisement for A-1 employment. He was told by Corcoran that only Union members of CAS were laid off and that nonunion A-1 employees were never laid off. Corcoran also said that he planned to "phase out" CAS, with "A-1 ... taking over the sprinkler work." On January 9, 1976, the Union filed unfair labor practice charges against CAS and A-1, alleging that the Union's collective-bargaining agreement with CAS was applicable to A-1, and that Corcoran had diverted CAS bargaining unit work to A-1 without notifying or bargaining with the Union. Thus began a tortured procedural history that has encompassed a full decade, and has included two hearings before an administrative law judge ("ALJ"), three Board decisions, and three appeals to this court.
 
 
 7
 After the first hearing in August 1976, the ALJ concluded that CAS and A-1 were a single employer for collective-bargaining purposes, and that Corcoran had used his bidding power over CAS and A-1 to reduce the amount of work for CAS employees with the intent of ultimately dissolving CAS. The Board, however, disagreed with the ALJ's findings and initially concluded that no Union work had been diverted from CAS to A-1.[3] After the Union petitioned for review, this court remanded the case to the Board in Road Sprinkler Fitters Local Union No. 669 v. NLRB, [hereinafter cited as Road Sprinkler Fitters I ].[4]
 
 
 8
 On remand, the Board reaffirmed its previous finding of no unfair labor practice, concluding that the dispute involved the scope of the bargaining unit covered by the CAS collective-bargaining agreement, and that this topic was a permissive subject of bargaining. Hence, the Union's voluntary acceptance of a limited bargaining unit was sufficient to bar any duty to bargain.[5]
 
 
 9
 Once again the Union petitioned this court for review. We, in turn, once again remanded the case to the Board. In Road Sprinkler Fitters Local Union No. 669 v. NLRB [hereinafter cited as Road Sprinkler Fitters II ],[6] we concluded that the allocation of work to a bargaining unit is a "term and condition of employment," and therefore held that an employer may not unilaterally attempt to divert work away from a bargaining unit without fulfilling its statutory duty to bargain. Hence, leaving aside a clear and unmistakable waiver of the Union's right to bargain, we concluded that the proper question in this case was:
 
 
 10
 whether Corcoran changed the scope of CAS' activities or changed the method of allocating work between CAS and A-1 so as to have caused the CAS bargaining unit to lose work which, in the light of Corcoran's past practices, CAS would otherwise have been expected to perform.[7]
 
 
 11
 Recognizing that the change in relative fortunes of the two firms might well be the result of a change in Corcoran's bidding practices, we noted that,
 
 
 12
 [t]he crucial determinant is whether the change in relative economic fortunes was due to external economic circumstances or to a change in the employer's established practices.[8]
 
 
 13
 We concluded that a remand was necessary because the Board had failed to analyze the evidence in the record that, prior to 1975, A-1 was engaged in only small jobs and that beginning that year, Corcoran had used A-1 rather than CAS for most installation projects. On remand, the Board was instructed to
 
 
 14
 determine whether Corcoran engaged in conduct that deprived CAS of work which, in light of Corcoran's past practice, CAS would otherwise have been expected to perform. If the Board finds that Corcoran did engage in such conduct, it should either apply the "clear and unmistakable" standard to test whether the union agreed to that conduct, or explain why a different standard is inappropriate. If it concludes that there was an unwaived denial of the union's statutory rights, it should devise an appropriate remedy, which may, if warranted, include extension of the CAS collective bargaining agreement to the employees of A-1.[9]
 
 
 15
 At the suggestion of this court,[10] the Board ordered the record reopened for a new hearing before the ALJ "for the limited purpose of receiving evidence as to the issues of fact raised by the court's remand." After this hearing, the ALJ concluded that external market conditions did not justify the decline in CAS activity. Furthermore, the ALJ concluded that Corcoran had used his power over the bids made by both A-1 and CAS to increase A-1's installation work at the expense of CAS. Finally, the ALJ rejected union harassment and lower labor costs as justifications for this bidding behavior.
 
 
 16
 The Board agreed with the ALJ.[11] It found that Corcoran had deliberately diverted bargaining unit work from CAS to A-1 in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act,[12] and that the change in relative economic fortunes of CAS and A-1 was not caused by external economic circumstances. As a remedy, the Board ordered Corcoran to cease and desist from unilaterally diverting bargaining unit work without first bargaining with the Union. It further ordered Corcoran "to restore the status quo ante by resuming bidding jobs for CAS in the same manner as [he] bid jobs for CAS prior to the unlawful diversion of unit work,"[13] and to make whole former CAS employees for any lost earnings and benefits. The Board refused, however, to order the extension of the CAS collective-bargaining agreement to the employees of A-1 because the collective-bargaining agreement had expired in 1977, and because CAS and A-1 did not constitute a single appropriate bargaining unit.
 
 
 17
 Cross-petitions for review filed by the Union, CAS and A-1, and a petition for enforcement filed by the Board brought the case to this court for the third time.
 
 II. ANALYSIS
 A. The Second Hearing
 
 18
 CAS and A-1 first challenge the scope of the second hearing. They argue that it was reversible error to permit the introduction of evidence about events that took place after the close of the first August 1976 unfair labor practice hearing, and that the ALJ "totally relied" upon post-1976 evidence.
 
 
 19
 These arguments have absolutely no merit. As we recognized in Road Sprinkler Fitters II,[14] a decision to reopen the record is within the Board's discretion.[15] There was no abuse of that discretion in this case. The bulk of the evidence at the second hearing concerned the central and dispositive issue on remand: whether the decrease in CAS business was caused by external economic circumstances. Evidence was introduced that in the years following CAS's demise, union firms successfully competed with A-1. Although the evidence concerned events that took place after 1976, the evidence is undeniably relevant in that it supports the argument that the diversion of business from CAS before 1976 was not the result of impersonal market forces.
 
 
 20
 Furthermore, the claim that the ALJ "totally relied" on post-1976 evidence is patently false. Unquestionably, the most persuasive evidence in the record concerned the growth of A-1--and the corresponding decline of CAS--before 1976. The only event that took place after August 1976 was Corcoran's decision not to place any bids for CAS beginning in November 1976. The Union makes no claim, however, that this event constituted an "independent violation." Rather, the ultimate demise of CAS is simply further evidence of Corcoran's diversion of CAS business.
 
 
 21
 In any event, the Union's complaint alleged a continuing violation--the diversion of bargaining unit work to A-1--and under clearly established legal principles, the Board may consider evidence relating to this continuing violation. In NLRB v. Fant Milling Co.,[16] the Supreme Court held that the Board was not precluded from dealing with unfair labor practices that occur after the filing of an initial unfair labor practice charge if the new unfair labor practices are "related to" the initial charge and "grow out of them while the proceeding is pending before the Board."[17] Without doubt, the further diversion of CAS business between August 1976 and November 1976 is "related to" the charge of diversion before August 1976.
 
 B. The Board's Findings
 
 22
 CAS and A-1 next contend that the Board's finding of an unfair labor practice is not supported by substantial evidence. We find that the record evidence overwhelmingly supports the finding of an unfair labor practice, and thus uphold the Board's conclusion.
 
 
 23
 It is uncontroverted that A-1's installation business increased dramatically in 1975 and that during this same period, CAS's volume of business dropped abruptly. In 1974, A-1 made 21 installation bids--successful and otherwise--and A-1's largest successful bid only amounted to $3,087. Only one year later, A-1 made 15 successful bids, and its largest bid jumped to $51,900. By 1976, A-1's gross earnings had increased at least fourfold over their 1974 level and the number of successful bids climbed to 24. In sharp contrast, the number of successful CAS bids dropped from 27 to 3 between 1974 and 1976. While CAS's highest bid in 1974 was $71,540, its highest bid in 1976 was only $6,037. Even Corcoran conceded that, beginning in 1976, many former CAS customers became customers of A-1.[18]
 
 
 24
 With evidence of this uncontested change in the relative fortunes of the two companies, the only real issue faced by the Board after the second hearing was whether these changes were caused by external market circumstances or by Corcoran's diversion of bargaining unit work. Once again, the evidence persuasively supports the Board's conclusion that market conditions had little to do with the demise of CAS. Several union companies testified that they regularly bid against A-1, and that union firms often prevailed over A-1 and other nonunion firms. Even Corcoran conceded that there exists no separate "union" and "nonunion" markets, and that he often bid for jobs that required payment of the prevailing wage--jobs in which union firms are not at a competitive disadvantage. Although some witnesses testified that the number of nonunion firms was growing, this growth alone does not explain the sudden drop in CAS business.
 
 
 25
 Corcoran offers nothing to counter this compelling evidence that market circumstances had little to do with the change in the allocation of work between A-1 and CAS. Instead, he merely makes the irrelevant point that the record establishes only two examples of work directly transferred from CAS to A-1.[19] In Road Sprinkler Fitters II, however, we held that a change in CAS's activities or a change in the method of allocating work between A-1 and CAS was a bargainable issue.[20] Under the law of the case, therefore, the Board did not need to find a direct transfer of a job from CAS to A-1 if it found that Corcoran was using A-1 to perform the type of work traditionally performed by CAS. With compelling evidence that external market forces did not cause the decline in CAS business, the inescapable conclusion is that Corcoran illegally diverted bargaining unit work without bargaining with the Union.
 
 
 26
 Other arguments made by Corcoran are equally infirm. Corcoran claims that he ceased bidding for CAS in November 1976 because he could no longer hire Union fitters. He attributes this inability to attract Union fitters to the Union's harassment of CAS employees. The most obvious flaw in this argument, of course, is that it does not explain the diversion of CAS work before November 1976. Instead, at best, it merely explains Corcoran's decision to stop placing bids for an already decimated CAS. In any event, this claim of harassment finds no support in the record. Indeed, the only alleged examples of harassment are representational picketing by the Union at A-1 jobs, and the fining of Union members who violated Union rules by working for the nonunion A-1. In neither instance did the Union harass CAS employees.[21] In sum, we easily conclude that substantial evidence supports the Board's conclusion that Corcoran diverted work traditionally performed by CAS to A-1, without giving the Union any opportunity to bargain.[22]
 
 C. The Remedy
 
 27
 The only substantial issue in this case is the appropriate remedy. Section 10(c) of the Act gives the Board wide discretion in devising remedial measures.[23] Judicial review of the Board's choice of remedies is limited to ensuring that the remedies effectuate the policies of the Act and are tailored to the nature of the particular unfair labor practice in question.[24] Under this deferential standard of review, we have little difficulty upholding the Board's choice of remedies in this case. Before the Board, the Union principally argued that the Board should order the extension of the CAS collective-bargaining agreement to A-1. This the Board declined to do. We agree with the Board that such an extension is not necessary in light of the status quo ante remedy granted in this case.
 
 
 28
 During oral argument, it became clear to this court that the dispute between the Union and the Board is more apparent than real; the dispute reflects a misunderstanding about the meaning of the Board's remedy rather than a disagreement about its adequacy. The remedy first confirms that the Union has bargaining rights with respect to all mandatory subjects of bargaining for all current and future employees of CAS and for all previous CAS employees improperly displaced by virtue of the illegal diversion of bargaining unit work. These bargaining rights include the right to bargain about seniority and other job rights that improperly displaced employees can exercise. Second, all CAS bargaining unit employees who suffered as a consequence of the illegal diversion of work from CAS are entitled to be made whole. This make-whole remedy will include back pay attributable to the illegal diversion, including back pay for any ongoing A-1 jobs that Corcoran is unable to assign immediately to CAS. Details of these remedial issues must await compliance proceedings. Third, the Board's order requires that Corcoran operate A-1 and CAS in the same manner as he did before the illegal diversion. Therefore, A-1 will have only small jobs and will not compete with CAS.
 
 
 29
 As we interpret the remedy in this case--and the Board's counsel represented that our interpretation is the correct one--the Board's order fully comports with Fibreboard Paper Products Corp.[25] In Fibreboard, the Board ordered the employer to restore the status quo ante. That is exactly the relief granted the Union in this case. A-1 will no longer operate as a large installation firm; all such installation work must be performed by CAS. As a consequence, A-1 will not compete for installation bids with CAS. Union fears of monitoring problems are therefore unfounded. If Corcoran wishes to compete in the sprinkler installation market he must use CAS and cannot use A-1, unless a lawful change is made pursuant to good faith bargaining under the National Labor Relations Act. Finally, once the status quo ante is restored, A-1 and CAS will become very different employing units. While CAS will employ almost exclusively sprinkler fitters, A-1 will employ few--if any--fitters. Just as A-1 and CAS constituted separate bargaining units in 1974, they will constitute different units after restoration of the status quo ante. In light of the Act's "guarantee of the right of [A-1] employees to refrain from representational bargaining,"[26] we conclude that the Board did not err in refusing to extend the CAS collective-bargaining agreement to A-1.
 
 
 30
 The cases cited by the Union are easily distinguished. Although the Board ordered the extension of collective-bargaining agreements in both Don Burgess Construction Corp.[27] and Appalachian Construction, Inc.,[28] in neither case was the nonunion affiliate a different bargaining unit. Instead, in both Burgess Construction and Appalachian Construction, the work performed by the nonunion firms was indistinguishable from that performed by the union firm. Unlike the instant case, therefore, a true status quo ante remedy required the extension of the collective-bargaining agreement in both Burgess Construction and Appalachian Construction.
 
 
 31
 The only apparent difference between the remedy imposed in Fibreboard and that imposed in this case is that the Board ordered back pay without reinstatement of former CAS employees. However, reinstatement, in traditional terms, is unnecessary under the circumstances of the instant case. Obviously, a number of bargaining unit employees must be "reinstated" to accomplish the status quo ante relief. But the Board cannot reasonably require more because to do so would be to ignore the economic realities of the employer's operation. Unlike the employer in Fibreboard, Corcoran's need for employees will depend on the number of bids won by CAS. In a potentially everchanging and fluctuating employment market, "reinstatement" is an empty notion. Given the economic realities of the sprinkler fitter business, as well as the passing of ten years since Corcoran's illegal diversion of work, we conclude that the Board correctly declined to order reinstatement in traditional terms, i.e. apart from its order requiring a restoration of the status quo. As the exclusive bargaining representative for both past and future CAS employees, of course, the Union has the right to bargain with CAS over the seniority and other job rights that former CAS employees will exercise.
 
 III. CONCLUSION
 
 32
 After a decade of litigation--ten years of hearings, decisions and appeals somewhat reminiscent of the case of Jarndyce v. Jarndyce in Charles Dickens' Bleak House --this case finally comes to a close. The record in this case contains overwhelming evidence of an illegal diversion of bargaining unit work by Corcoran. The Board's remedy is entirely adequate and will place the Union in the same circumstances it enjoyed in the status quo ante. We grant the Board's petition for enforcement and deny the cross-petitions for review.
 
 
 33
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 29 U.S.C. Sec. 158(a)(1) & (5) (1982)
 
 
 [2]
 A "double-breasted operation" consists of a union firm and a nonunion firm established by the same employer. The theory of such an operation is that union and nonunion firms compete in different and separate markets. See South Prairie Construction Co. v. Local No. 627, International Union of Operation Engineers, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); 1 THE DEVELOPING LABOR LAW 676-81 (C. Morris 2d ed. 1983)
 
 
 [3]
 233 N.L.R.B. 38 (1977)
 
 
 [4]
 600 F.2d 918 (D.C.Cir.1979). We concluded that the Board had failed to apply a "clear and unmistakable" waiver requirement to the Union's alleged acquiescence to a collective-bargaining agreement limited to CAS employees
 
 
 [5]
 250 N.L.R.B. 217 (1980)
 
 
 [6]
 676 F.2d 826 (D.C.Cir.1982)
 
 
 [7]
 Id. at 831-32
 
 
 [8]
 Id. at 832
 
 
 [9]
 Id. at 834
 
 
 [10]
 We said "[t]he Board is, of course, free to decide in the first instance whether anything in our present opinion should cause it to allow the record to be reopened." Id. at 829 n. 10
 
 
 [11]
 273 N.L.R.B. No. 124 (1984)
 
 
 [12]
 29 U.S.C. Sec. 158(a)(1) & (5) (1982)
 
 
 [13]
 273 N.L.R.B. No. 124, at 11
 
 
 [14]
 676 F.2d at 829 n. 10
 
 
 [15]
 See NLRB v. Amalgamated Clothing & Textile Workers Union, 662 F.2d 1044, 1045 (4th Cir.1981)
 
 
 [16]
 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959)
 
 
 [17]
 Id. at 309 (quoting National Licorice Co. v. NLRB, 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799 (1940))
 
 
 [18]
 Corcoran claimed that he bid 150 times for CAS in 1976, but that these bids were unsuccessful. However, he provided absolutely no documentation to support this claim. The record reflects only the three successful bids in 1976. Given CAS's rapid decline in fortune between 1974 and 1976, we conclude that the ALJ and the Board correctly discounted Corcoran's unsupported assertions
 
 
 [19]
 The two examples of direct diversion of bargaining unit work are: (1) In early 1976, Corcoran originally intended to assign a job at Alma College to A-1, then decided to assign the job to CAS as a "goodwill gesture." When the unfair labor practice charge was filed, Corcoran reassigned the job to A-1. (2) In 1975, Corcoran bid on behalf of CAS on two jobs for Engelhardt Construction, but less than two hours later filed a lower, unsolicited bid on behalf of A-1
 
 
 [20]
 676 F.2d at 831-32
 
 
 [21]
 Indeed, in fall 1975, one employee was told that Corcoran was not interested in hiring sprinkler fitters for CAS. Corcoran also told this employee of his plans to "phase out" CAS, with A-1 taking over CAS's sprinkler business
 
 
 [22]
 Corcoran argues that his decision to stop placing bids on behalf of CAS is not a mandatory subject of bargaining under First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). The short answer to this contention is that the law of this case is otherwise. See Road Sprinkler Fitters II, 676 F.2d at 831. We think First National Maintenance is inapposite in any event. That case did not involve a diversion of bargaining unit work; instead it involved an employer's decision to terminate a contract for reasons unrelated to the employer's work force. A more apt precedent is Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), which held that an employer's decision to "contract-out" maintenance services previously performed by bargaining unit personnel was a mandatory subject of bargaining. Several courts have subsequently reaffirmed the principle that the diversion of bargaining unit work is a mandatory subject of bargaining. See Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1088 (1st Cir.1981); NLRB v. Triumph Curing Center, 571 F.2d 462, 471-74 (9th Cir.1978); Office and Professional Employees International Union, Local 425 v. NLRB, 419 F.2d 314, 321 (D.C.Cir.1969)
 
 
 [23]
 29 U.S.C. Sec. 160(c) (1982)
 
 
 [24]
 See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 104 S.Ct. 2803, 2812-13, 81 L.Ed.2d 732 (1984); Fibreboard Paper Products Corp., 379 U.S. at 216, 85 S.Ct. at 405
 
 
 [25]
 138 N.L.R.B. 550, 554-55 (1962), enforced, 322 F.2d 411 (D.C.Cir.1963), aff'd, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)
 
 
 [26]
 Food Store Employees Union, Local No. 347 v. NLRB, 476 F.2d 546, 549-50 (D.C.Cir.1973) (upholding Board refusal to extend bargaining order to unrepresented store), rev'd on other grounds, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974)
 
 
 [27]
 227 N.L.R.B. 765 (1977), enforced, 596 F.2d 378 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979)
 
 
 [28]
 235 N.L.R.B. 685 (1978)