**PUERTO RICO TELEPHONE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 6460.**

United States Court of Appeals
First Circuit.

Heard Feb. 8, 1966.

Decided April 27, 1966.

984

Matthew E. Murray, Chicago, Ill., with whom Gonzalo Sifre, Fernando Ruiz-Suria, San Juan, P. R., Richard L. Marcus, Chicago, Ill., Sifre & Ruiz-Suria, San Juan, P. R., and Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., were on brief, for petitioner.

Norton J. Come, Washington, D. C., Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh and Richard S. Rodin, Washington, D. C., Attys., were on brief, for respondent.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This National Labor Relations Act case comes to us on the petition of the Puerto Rico Telephone Company to set aside and on the cross-petition of the National Labor Relations Board to enforce an unfair

labor practice order [1] issued by the Board against the company. The order is based upon the Board's findings [2] that the company violated Section 8(a)(5) and (1) of the Act [3] by unilaterally subcontracting work performed by its employees in the bargaining unit without first giving the union [4] notice and an opportunity to bargain with respect thereof; and also by refusing to furnish the union with relevant information as to the cause of layoffs of unit employees.

During the period involved in this case the company was engaged in a large scale modernization and expansion program mandated by the Puerto Rico Public Service Commission. This program, which began in 1958 and was enlarged in 1961, included, among other things, the removal and replacing of old telephones with dial sets, filling a large number of back orders for new phones, modernizing and expanding central exchanges and long distance circuits, and the installation and addition of cables. The entire project involved an expenditure of 130 million dollars with completion required by 1964.[5]

It was evident from the start that the company could not possibly carry out this program with its regular work force. Accordingly, the company decided to subcontract [6] and did subcontract a substantial amount of the work. It is undisputed that the company's decision to subcontract was motivated by business considerations. No antiunion animus was involved in this decision, but at no time did the company give the union prior notice or an opportunity to bargain with reference to any of these subcontracts. Most of these subcontracts involved removal and installation of telephones and the distribution and splicing of cable. There is evidence that the company could not have used its own employees exclusively on the program since it needed them to continue providing service at the same time the expansion program was in operation. Furthermore, this program frequently required the services of highly skilled technicians which it would have taken a considerable time to train.

In May of 1959 the company and the union entered into their first collective bargaining agreement which was effective through May 6, 1962. There was no clause in this agreement covering subcontracting. Negotiations for a new agreement began in October of 1961. At that time a number of subcontracts had been let and the company's subcontracting policy was causing the union serious concern. The union informed the company that it regarded the subcontracting as "a threat to employment." During this period of negotiations, which resulted in the signing of a new agreement on November 8, 1962, the union made repeated demands for the inclusion of a

---

1. The Board's decision and order issued on November 20, 1964, are reported at 149 NLRB. No. 84.

2. This case was heard originally by a trial examiner as provided in the Act. Upon review of the record of that proceeding the Board adopted the findings, conclusions and recommendations of the trial examiner.

3. "Sec. 8. (a) [i]t shall be an unfair labor practice for an employer—
    "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;
    *      *      *      *      *
    "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)."

4. Sindicato de Trabajadores Packinghouse, United Packinghouse Food & Allied Workers, District 9 of Puerto Rico, AFL–CIO, and its affiliate, Union de Empleados de la Industria del Telefono de Puerto Rico, Local 963.

5. In this connection the Commission stated "*  *  * we are arranging for continuous supervision, to the extent allowed us by law, over the expansion and improvement program we are ordering the Puerto Rico Telephone Company to carry out, so that we may be sure that it will develop as planned."

6. It is undisputed that the practice of subcontracting is not uncommon in the telephone industry and there is evidence that in the past this company had engaged subcontractors to augment its own work force.

clause limiting subcontracting.[7] The company resisted these demands on the grounds that subcontracting was its exclusive prerogative and that the use of subcontractors was necessary for the completion of its program. Also, there is evidence that during these negotiations the company assured the union that no unit employees would be laid off because of the company's subcontracting activities. Despite the negotiations, the parties could not agree on this issue and the upshot of the matter was that no subcontracting clause of any kind was included in the November 8 agreement.

We now reach the crucial period in this case. On November 9, the day after the execution of the new agreement, the company started laying off employees. This continued through March 31, 1963, during which period some 227 unit employees, 41 management employees and 37 temporary employees, were laid off. The employees were told that the layoffs were due to a reorganization of the company. In the course of the next few months the parites had numerous meetings with reference to the layoffs. The union attributed them to the subcontracting. The company denied this and claimed that these layoffs were entirely the result of the "economic reorganization" of the company. It pointed out that the expansion program had reached its peak in mid 1962 and was tapering off; that a recent survey showed the company was greatly overstaffed and that a decision had been made earlier in 1962 to reduce its personnel over a period of time. Also, there was evidence that this "economic reorganization" was motivated, at least in part, by the refusal of the Public Service Commission in June of 1962 to grant a temporary rate increase to the company.

In March of 1963, the parties agreed that the dispute concerning the layoffs would be submitted to the grievance committee established under the November 8 agreement. At the March 14 meeting of this committee the union asked the company to submit data[8] that would prove to the committee that the layoffs were due to "economic reorganization" as claimed. The company rejected this request. The union took the position that since it had been denied the requested information, there was no point in continuing the discussions. It then proposed that the matter be submitted to arbitration but the company would not agree.

■■ This brings us to the issue of whether there is substantial evidence to support the Board's finding that the company violated the Act by refusing to furnish this information. To be sure, an employer is not required to furnish all the information the union thinks might be helpful in processing grievances. However, an employer violates Section 8(a)(5) and (1) of the Act by refusing during the term of a collective bargaining agreement, to furnish information requested by the union if such information is *relevant* to a grievance or to the administration or policing of the agreement. Curtiss-Wright Corp., Wright Aero. Div. v. N. L. R. B., 347 F.2d 61, 65 (3d Cir. 1965). As stated in that case at p. 69: "Once relevance is determined, an employer's refusal to honor a request is a per se violation of the Act." The company contends that the requested information was irrelevant. We do not agree with this contention. The information requested by the union was relevant in evaluating the pending grievances. The company claimed the layoffs were for economic reasons. The union merely wanted the company to prove that such

7. The record shows that subcontracting was a major issue in the more than thirty bargaining sessions of the parties preceding the execution of the agreement.

8. The data requested was as follows:
"1. Volume of business during the months of January, February and March 1963 compared with November 1962 when the contract was signed.

2. Earnings derived by the company from its volume of business.
3. Amounts saved by the company on account of wages of those laid off.
4. Is someone performing the labor that the laid off personnel performed?
5. How much will the company save?"

economic reasons existed. Clearly the data concerning volume of business, earnings, wage savings due to layoffs, etc., became relevant once the company raised the economic issue as the reason for the layoffs. Whether or not the company must furnish the information requested here cannot be separated from the overriding issue of whether or not unilateral subcontracting of the Fibreboard type was taking place as will hereinafter be discussed. But with the requested information in hand the union certainly would be better equipped to fulfill its obligations under Section 8(d) of the Act to administer the collective bargaining agreement.

We are satisfied there is substantial evidence in the record when viewed as a whole to support the Board's finding that such information was relevant and, therefore, should have been furnished. Curtiss-Wright Corp., Wright Aero. Div. v. N. L. R. B., supra; J. I. Case Company v. N. L. R. B., 253 F.2d 149 (7th Cir. 1958); N. L. R. B. v. F. W. Woolworth Co., 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235, reversing 235 F.2d 319 (9th Cir. 1956); Timken Roller Bearing Company v. N. L. R. B., 325 F.2d 746 (6th Cir. 1963), cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964).

We come now to the question of whether the record supports the Board's finding that the company's subcontracting activities violated Section 8(a) (5) and (1) of the Act. In support of its finding, the Board relied upon the principles announced in Fibreboard Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In that case the employer for reasons of economy, replaced its *entire* maintenance crew in the bargaining unit with the services of a subcontractor without first giving the union notice and an opportunity to bargain. In holding that the employer's

conduct violated Section 8(a) (5) of the Act, the Supreme Court said that this type of contracting out is covered by the phrase "terms and conditions of employment" within the meaning of Section 8(d) and is a mandatory subject of collective bargaining under that section.

The Court recognized, however, that to require an employer to bargain about all subcontracting could cause undesirable interference with the management of its business and emphasized the restricted scope of its holding. One limitation strongly implicit in Fibreboard, see 379 U.S. at 212, 215, 85 S.Ct. 398, and explicit in recent decisions of the Board itself, e. g., Westinghouse Electric Corp., 150 N.L.R.B. No. 136 (1965), is that, at least when the subcontracting is designed to meet some temporary or transient need rather than to alter permanently the basic structure of the enterprise, an employer is not obligated to bargain unless the subcontracting adversely affects the unit's present employees. The reason for this is evident. Subcontracting like many other managerial decisions, may often touch the "terms and conditions of employment" only remotely, if at all. An employer should not be required to bargain about such subcontracting any more than he is required to bargain about these other matters which have been held to be outside the scope of mandatory negotiation. See, e. g., Sylvania Electric Products, Inc. v. N. L. R. B., 291 F.2d 128 (1st Cir. 1961), cert. denied, 368 U.S. 926, 82 S.Ct. 360, 7 L.Ed.2d 190. Thus, a necessary condition to requiring an employer to bargain before entering into a subcontract is that the subcontract have an immediate adverse effect upon the bargaining unit.

Some forty-five subcontracts were in force during the period covered by the complaint. The Board relies on seven of them [9] to prove the unfair labor

9. These seven are as follows:
    Contract between the company and ITT Puerto Rico for installation of stations in San Juan, dated May 15, 1962.

Contract between the company nad ITT Puerto Rico for installation of PBX and PABX switchboards, dated May 15, 1962.
    Contract between the company and United Communications Co. for installa-

practices charged. Of this number only the subcontracts of February 4 and 14, 1963, were executed within the statutory period.[10] Although the remaining subcontracts may have been admissible as background evidence, it seems to us that the subcontracts relied upon to establish the substantive unfair labor practice charges themselves must be executed within the six months statutory period. Local Lodge No. 1424, International Association of Machinists AFL–CIO v. N. L. R. B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), otherwise they are barred by the proviso of § 10(b). Consequently, the Board's case here must stand or fall on the two February 1963 subcontracts. We think there is a total failure of evidence that these two subcontracts adversely affected the bargaining unit.

The February 4 subcontract involved the distribution of a large underground and aerial feeder cable. The actual laying of this cable was done by the regular company employees. The work that was subcontracted involved only splicing which requires skilled workmanship. The job was subcontracted only because the company did not have enough splicers of its own to do the work. There is no evidence that any splicer employed by the company was replaced as a result of this subcontract. Although there is evidence that some sixteen splicers of various classes were laid off some time during the complaint period, the number of splicers employed by the company actually increased during this period.

The February 14 subcontract pertained to the removal of all old telephones in certain areas of Puerto Rico. It involved the replacement of some 38,000–50,000 telephones over a six months period. There was uncontradicted evidence that while this was being done company employees were doing their normal work and no company employees were laid off as a result of this subcontract. Although installers were dismissed during the period covered by the complaint, the total number of installers increased during this period.

In short, we cannot say there is substantial evidence in the record, taken as a whole, from which it may reasonably be inferred that the bargaining unit or any employee in it suffered a significant detriment or was otherwise adversely affected as a direct result of these two subcontracts. We, therefore, conclude that the company's subcontracting activities did not violate Section 8(a) (5) and (1) of the Act.

A decree will be entered enforcing only that part of the order which relates to the refusal of the petitioner to furnish the union with relevant information respecting the cause of the layoffs of unit employees.

---

tion of stations in San Juan, dated May 24, 1962.

Contract between the company and Henkels & McCoy Co. for installation of cable, dated June 27, 1962.

Letter relating to contract between the company and ITT Puerto Rico for performance of a "Test Job" in the company's central offices, dated August 30, 1962.

Contract between the company and ITT Puerto Rico for distribution of cable No. 46 in the Santurce area, dated February 4, 1963.

Contract between the company and ITT Puerto Rico for station installations, dated February 14, 1963.

10. Section 10(b) of the Act provides that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge. The union's charge was filed on March 8, 1963.