AMCAR DIVISION, ACF INDUSTRIES, INCORPORATED, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Brotherhood of Railway Carmen of the United States and Canada, Lodge 365, AFL–CIO–CLC, Intervenor-Respondent.

No. 77–1713.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1978.

Decided Feb. 6, 1979.

---

John E. Jay of Parker, Chapin, Flattau & Klimpl, New York City, for petitioner; Johnna G. Torsone, New York City, on the brief.

John H. Ferguson, Atty., N. L. R. B., Washington, D. C., for respondent; Frederick Havard, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on the brief.

Charles A. Werner of Schuchat, Cook & Werner, St. Louis, Mo., for intervenor-respondent.

Before VAN OOSTERHOUT, Senior Circuit Judge, LAY, Circuit Judge, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge.

This matter is before the court upon the petition of AMCAR Division, ACF Industries, Inc. (AMCAR) for review and on cross-petition of the National Relations Board (NLRB) for enforcement of an NLRB Order.[1]

The NLRB affirmed the rulings, findings and conclusions of the Administrative Law Judge who heard this case. The Administrative Law Judge concluded that AMCAR had violated Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1),[2] by subcontracting out bargaining unit production work without notifying the union, by refusing to furnish the union with requested information concerning the subcontracting, and by refusing to provide the union with a requested copy of a handwriting analysis. In a footnote, the NLRB specifically agreed with the Administrative Law Judge's finding that the six month statute of limitations under the National Labor Relations Act, 29 U.S.C. § 160(b), did not begin to run in this case until the union discovered the subcontracting.

The NLRB also adopted the Order of the Administrative Law Judge which provided in substance that AMCAR would cease and desist from (1) unilaterally subcontracting bargaining unit work without notice to the union, and (2) failing or refusing to supply the union with lawfully requested information concerning subcontracting or the processing of grievances. In addition, AMCAR was required to take certain affirmative action, including the following:

(a) Reinstate the trailer hitch and hitch components assembly operation and parts fabrication previously performed by its employees represented by the Union, to the extent that Respondent has customer orders, or will have customer orders, or stockpiles, for sale or repair of trailer hitches or components or parts, and uses or will use or stockpiles for use such products in its completion or repair of railroad flatcars.

(b) Offer to those employees, who were discharged or laid off as a result of the subcontracting of the trailer hitch related work, immediate and full reinstatement to their former positions, or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges, and make each of them whole for any loss of pay suffered . . .

(c) Bargain collectively with the Union as to any continuing unremedied effects on the bargaining unit as a result of the unlawful subcontracting of the hitch-related work not remedied by the preceding subparagraphs (a) and (b) of this paragraph 2, with respect to wages, hours, and other terms and conditions of employment.

(d) Give notice to the Union and bargain collectively with it concerning any future subcontracting of work performed by bargaining unit employees, unless specifically provided otherwise by the collective bargaining contract between the Union and Respondent.

(e) Comply with lawful requests of the Union for information concerning subcontracting, processing of grievances, and like matters pertaining to the Union's participation in administering the collective bargaining contract or in collective bargaining negotiations.

> (1) to interfere with, restrain, or coerce employees in the exercise of [their] rights
> . . .
> \* \* \* \* \* \*
> (5) to refuse to bargain collectively with the representatives of his employees

* Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

1. *See Amcar Division, ACF Industries, Inc. v. NLRB*, 231 N.L.R.B. No. 20 (1977).

2. §§ 8(a)(5) and (1) read as follows:
 (a) It shall be an unfair labor practice for an employer—

Joint Appendix at 59–60. We enforce the order of the Board.

## FACTS

We believe the primary facts set forth in this section are not in dispute. The principal office and plant of the Amcar Division is in St. Louis, Missouri. The St. Louis AMCAR has been engaged in the manufacture, sale, and distribution of railroad freight cars and related products, including trailer hitches. These trailer hitches are installed on flatcars used to transport trailers from tractor-trailer trucks.

AMCAR has made five different models of trailer hitches. The models vary only in size and not in style. In order to assemble the hitches, fixtures called jigs hold the various parts in place. As the Administrative Law Judge found:

> Respondent has produced, in its plant with its own employees, all of the (fabricated) parts, components, and completed hitches for all five models, and has also produced the various jigs for assembling the different model components and final assemblies. The parts are made from raw steel by the Fabrication Department, where they are punched, formed, and sheared. From Fabrication the parts are moved to the hitch area or areas of Department 125, where the assembly of parts into components and the assembly of components into completed hitches is performed. The main work in assembly is performed by welders who place the parts, and later the components, in suitable jigs for tack welding and final welding. Some of the work is also performed by employees classified as fitters, tackers, and drill press operators. The jigs used in assembly are made in Respondent's tool and die shop.

Joint Appendix at 37.

During the last half of 1972, the company began phasing out the production of Model 4 trailer hitches in order to start the production of Model 5 hitches. In January, 1973, daily production of Model 5 hitches was between 5 and 10, and in March between 25 and 30. In order to produce more

Model 5 hitches, the company expanded the hitch department and bought additional equipment. One additional building was equipped to perform final assembly of the Model 5 hitch. In addition, an area used to perform boxcar roof assembly was transformed into an area for performing sub assembly work for the Model 5 hitch by adding various equipment. Once this was completed, the production requirements increased to 50 hitches per day, six days a week, or 300 hitches per week. This continued through April of 1974. The hitch department was not able to meet this requirement; it requested and received better assistance in receiving parts and moving them. In April of 1974, the department was meeting the quota requirement. However, starting in May, 1974, the quota was changed to 60 hitches per day with a five day work week in order to avoid Saturday overtime. Production of 60 hitches per day was never achieved, although production did reach somewhere between 52 and 55. Two shifts daily were being used.

In November, 1974, the production quota was reduced to 30 hitches per day. According to the testimony of Mr. Meacham, who had been superintendent of the trailer hitch department during this time, the reduction was due to cancellations of orders for Model 5 hitches, and the 30 per day quota was largely for stockpiling for future use. The biggest portion of the second shift was eliminated according to Superintendent Meacham. In March, 1975, production of the Model 5 hitch was stopped altogether.

During the 1974–75 time period, the company was subcontracting out hitch components and parts. These subcontracts involved components for both the current Model 5 and for earlier Models A and 2. The contracts involved in excess of 18,000 manhours of work.

The Administrative Law Judge found that:

> There were 14 groups of subcontracts (grouped by subject and contractor) totalling 35 subcontracts, the first let on March 25, 1974, the second on June 14, 1974, the next 29 in the period between

July 1 and December 31, 1974, and additional two subcontracts in January and March, 1975, and the last two in May and August 1975, when the plant was on strike.

Joint Appendix at 40. The General Counsel for the NLRB has not complained of the first two subcontracts, which were small. The bulk of the subcontracting started in July of 1974, two months after AMCAR eliminated the Saturday shift for the 120 employees working in the hitch assembly section. As nearly as the union was able to tell from what may have been incomplete records, the first lay-offs from the hitch department occurred in September of 1974. The Administrative Law Judge found that between September, 1974 and November, 1975, there were layoffs of 113 welders, 16 fitters, 6 tackers, and 11 drill press operators and transfers of 5 welders and 1 fitter, either directly from Department 125 or related departments. While it was not clear that all of these persons were engaged in trailer hitch or hitch component production, approximately 120 of them were.[3]

A union employee first discovered the subcontracting near the end of September, 1975. The employee talked to hitch department superintendent Meacham, who told him that no more work would be subcontracted out and that they would try to bring back some of the subcontracted work. The employee did not notify the union officials of the subcontracting at this time. In December, 1975 there was only one hitch welder working in Department 125 and he was told he was being removed from his job

because AMCAR had decided to subcontract the work. This was reported to the union agent who for the first time learned of possible subcontracting and began to try to verify it with the company.

On December 19, 1975, when the subcontracting was verified, the union agent requested employee compensation for loss of work and earnings, and was informed that there would be no compensation. A formal charge was filed by the union on December 30, 1975, and was twice amended. The formal complaint was issued February 25, 1976 and, among other things, alleged that since on or about July 1, 1975, AMCAR had refused to collectively bargain about the subcontracting of bargaining unit work.

On December 30, 1975, demand was also made upon AMCAR for information relating to all subcontracts during the previous two years, including a job description and the number of man hours involved to perform each job. The union never received this information until the Administrative Law Judge ordered it delivered during the course of the trial. Following this disclosure, General Counsel moved to amend the complaint to allege that AMCAR had refused to collectively bargain with the union regarding the subcontracting of work since July 1, 1974 rather than July 1, 1975. The Administrative Law Judge reserved ruling on this requested amendment. He allowed the amendment when he decided the case.

## I. DUTY TO BARGAIN

The leading case on whether there is a duty to bargain over the subcontracting of

---

**3.** The Administrative Law Judge found:

While it was not clear that all of the employees in Department 125 and the related departments, who were laid off or transferred to other jobs in those periods of time were necessarily engaged in trailer hitch or hitch components production, it was clear that among them were the employees laid off or transferred when the two shifts of 60 employees each, or a total of 120 employees, who were engaged through most of 1974 in trailer hitch and components production, were reduced near the end of 1974, by half. (Superintendent Meacham thought it was accomplished by practical elimination of the second shift except for six of eight employ-

ees; Union Agent Goodrick said it was by reducing each shift to half its size). And clearly among them were the group of employees laid off or transferred at the end of March 1975, when all Model 5 production was terminated reducing the approximately 60 employees engaged in trailer hitch or component assembly to 5 employees (as both Meacham and Goodrick testified). Goodrick further testified that these five remaining employees were welders engaged in welding of replacement components for various models, and that after the May 2–September 22, 1975 strike the five welders were reduced to one.
Joint Appendix at 44.

work is *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Rather than renew a collective bargaining agreement, Fibreboard determined that it could make substantial savings by contracting out the maintenance work performed by bargaining unit employees. The company eliminated the entire bargaining unit without any negotiations with the union. The Supreme Court found that:

> on the facts of this case, the "contracting out" of the work previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively.

*Id.* at 209, 85 S.Ct. at 402. The court pointed out that the maintenance work would be performed in the plant and the company was merely replacing one group of employees with another group. The company would be reducing its cost by:

> reducing the work force, decreasing fringe benefits, and eliminating overtime payments. These have long been regarded as matters peculiarly suitable for resolution within the collective bargaining framework . . . .

*Id.* at 213–14, 85 S.Ct. at 404. The language throughout the opinion confines the holding of *Fibreboard* to the particular facts of that case. The majority opinion states:

> Because of the limited grant of certiorari, we are concerned here only with whether the subject upon which the employer allegedly refused to bargain—contracting out of plant maintenance work previously performed by employees in the bargaining unit, which employees were capable of continuing to perform—is covered by the phrase "terms and conditions of employment" within the meaning of § 8(d).
>
> * * * * * *
>
> We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of "contracting out" involved in this case—the replacement of employees in the existing bargaining unit

with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). Our decision need not and does not encompass other forms of "contracting out" or "subcontracting" which arise daily in our complex economy.

*Id.* at 210, 215, 85 S.Ct. at 402, 405.

AMCAR argues that its decision to subcontract (1) does not fall within the limited confines of *Fibreboard*, (2) was based on operational considerations, (3) was not detrimental to the bargaining unit, and (4) was not based on anti-union animus.

At the outset it should be noted that the Board's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 464, 95 L.Ed. 456, 467 (1951); 29 U.S.C. § 160(e) and (f). We are also aware that the credibility of witnesses is primarily one for determination by the trier of facts. *See Fruin-Colnon Corp. v. NLRB*, 571 F.2d 1017, 1022 (8th Cir. 1978), although the rule is not to be mechanically applied. The Administrative Law Judge here did have to make credibility choices, and chose in large part to believe the union witnesses who testified on behalf of the Board. We believe the record as a whole supports these credibility findings.

■ There was no finding of anti-union animus in *Fibreboard*, but nevertheless the company was held to have a duty to bargain. Thus, that factor is not controlling here. AMCAR's other arguments must also fall although they are entitled to greater discussion.

This case involves the balancing of managerial prerogatives with the collective bargaining rights of employees. In *Fibreboard*, the court found that the requirement to bargain ". . . would not significantly abridge [the employer's] freedom to manage the business" where the subcontracting merely involved the substitution of one set of employees for another. *Id.* 379 U.S. at 213, 85 S.Ct. at 404.

Subsequent decisions have recognized there must be a substantial adverse effect on the bargaining unit in order for an unfair labor practice to occur. *See NLRB v. King Radio Corp.*, 416 F.2d 569 (10th Cir. 1969), *cert. denied*, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420 (1970); *District 50, United Mine Workers of America, Local 13942 v. NLRB*, 358 F.2d 234 (4th Cir. 1966). *See also Puerto Rico Telephone Co. v. NLRB*, 359 F.2d 983 (1st Cir. 1966), which uses the term "immediate" adverse effect. Each of the above cases found there was no duty to bargain with the employees.[4]

We believe that the subcontracting here did have a substantial adverse effect on the employees and does fall within the confines of *Fibreboard* for the reasons which follow.

Factually this case is similar to *Fibreboard* in that the company did in some instances provide the subcontractors with company equipment, i. e., jigs used to assemble the hitch parts during production. The work did not differ in any respect from bargaining unit work which had been or was being performed on a daily basis at the plant. The Administrative Law Judge noted that the subcontracting did not appear to be economically motivated. Yet the Administrative Law Judge found that even at the peak of Model 5 production in May of 1974 the company eliminated Saturday overtime, used only two shifts in hitch assembly, did not always use three shifts in fabrication and when it did it was a skeleton crew of eight employees at the most. Eliminating overtime payments was one of

the matters which the *Fibreboard* court found has "long been regarded as . . . peculiarly suitable for resolution within the collective bargaining framework . . ." *Id.* 379 U.S. at 213–14, 85 S.Ct. at 404. As was noted in the fact section, the bulk of the subcontracting started two months after AMCAR eliminated the Saturday work.

AMCAR's argument that it was forced to subcontract out the hitch work because of limitations of space, equipment, air and electric power loses a great deal of its weight in light of the fact that it continued to subcontract out work after the end of October when layoffs allegedly due to cancellations of orders for the Model 5 hitch occurred. It is true that a substantial portion of the subcontracts were let in the early part of October and before the cancellation of orders for Model 5 hitches. However, the company has produced no valid explanation for the fact that during the three month period between November, 1974 and January, 1975, the company let seven subcontracts involving almost 5900 hours of work while union records which allegedly were incomplete showed at least 30 employees laid off or transferred during the period and there was testimony from the union agent that in December alone 40 hitch welders left the department. Joint appendix at 148. The subcontracting of this work obviously had a substantial adverse effect on the bargaining unit. Although the evidence was conflicting, there was testimony that space and equipment were available in another building owned

---

4. In *United Mine Workers* no employees had been laid off and there was no substantial loss of overtime work. In *King Radio Corp.* the subcontracting amounted to 124 work hours while the employees were on strike and was temporary in nature. In *Puerto Rico* two subcontracts were involved—one in which the company did not have enough skilled people to perform it and actually hired more people with this job description during the complaint period and a second where no company employees were laid off as a result of the subcontract. It is clear the same facts are not present here since the subcontracts amounted to over 18,000 manhours, and there were layoffs.

 A separate line of cases finding no duty to bargain are those involving a partial closure.

*See Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1039 (8th Cir. 1976); *NLRB v. Drapery Mfg. Co.*, 425 F.2d 1026, 1028 (8th Cir. 1970); *Morrison Cafeterias Consol., Inc. v. NLRB*, 431 F.2d 254, 257 (8th Cir. 1970); *NLRB v. William J. Burns Int'l Detective Agency*, 346 F.2d 897 (8th Cir. 1965), which all involved total closure of one entire plant or operation. *See also NLRB v. Adams Dairy, Inc.*, 350 F.2d 108 (8th Cir. 1965), *cert. denied*, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966) where the company liquidated that part of its business handling milk distribution. This case does not involve a liquidation of operations. Therefore, the above cases are not strong support for AMCAR's contention that they have no duty to bargain based on operational considerations.

by the company known as the St. Louis Car Plant, and that space in the hitch area could have been rearranged or production schedules changed so as to provide room for the subcontracted work.

AMCAR also argues that it had no duty to bargain regarding subcontracting because the contract in effect at the time[5] contained no reference to subcontracting, but did contain a strong management rights clause and clauses which provided that this contract superseded all previous agreements and covered all the terms and conditions of employment. The Administrative Law Judge admitted testimony showing that the 1969–72 contract had contained a side letter requiring the company to notify the union of and bargain with it concerning subcontracting. This side letter was not present in the 1972–75 contract. However, the uncontradicted testimony showed that the omission was due to a statement by the company's negotiation chairman that the side letter was unnecessary because the company was under a statutory obligation to bargain about subcontracting. There was testimony also that the company had never before subcontracted production work. It had subcontracted maintenance work. The union agent testified that prior to subcontracting maintenance work the company had always notified him and provided an opportunity for discussion. In some cases, the company had decided after discussion with the union that the subcontracting was unnecessary.

■ We have no difficulty in finding that this testimony concerning prior bargaining over subcontracting was admissible. It is well established that collective bargaining agreements are not governed by ordinary contract law. *See Transportation-Communication Employees Union v. Union Pacific RR Co.,* 385 U.S. 157, 160–61, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966). For example, *Darnel v. East,* 573 F.2d 534, 537 (8th Cir. 1978), held that there need be no consideration for a stipulation that the parties

agree to abide by a collective bargaining agreement. The failure to mention a right in a bargaining agreement does not constitute a waiver of it even though there is a clause stating that the contract represents the entire agreement between the parties. *See Little Rock Airmotive, Inc. v. NLRB,* 455 F.2d 163, 168 n.9 (8th Cir. 1972); *Office and Professional Employees International Union, Local 425 v. NLRB,* 419 F.2d 314, 321 (10th Cir. 1969). There is even more reason why the contract's silence on the subject of subcontracting is not controlling where the company by its behavior had induced such silence.

■ Considering all of the above factors, we enforce the Labor Board's finding in this case that prior to subcontracting the unit work there was a duty to bargain. We are not saying that AMCAR would be required to use three shifts or work overtime or rearrange its hitch assembly area or production schedules. We are saying only that AMCAR must notify the union and bargain with it prior to subcontracting unit work.

## II. SIX MONTH STATUTE OF LIMITATIONS

■ It is provided in 29 U.S.C. § 160(b) that:

> . . . no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board

> . . . . .

The charge was filed December 30, 1975. The complaint alleged unfair labor practices occurring during the six month period beginning July 1, 1975. Only one subcontract was let during this period and that was while the union was on strike. The next most recent contract was let in May of 1975, which was also while the union was on strike. As previously detailed, the Administrative Law Judge's decision allowed amendment of the complaint to allege that unfair labor practices occurred during the

---

5. The bulk of the contracts were let during the 1972–75 contract period. Two contracts were let after that, but are insignificant to our deci-

sion here. The subsequent labor contract arrived at for 1975–78 was also silent on the subject of subcontracting.

period beginning July 1, 1974, which was a full year beyond the statute of limitations. This was also the time period when the bulk of the subcontracting occurred.

AMCAR contests the validity of this amendment.[6] The Administrative Law Judge allowed the amendment of the complaint:

. . . because Respondent concealed, and the Union had no notice of, the hitch

components and parts subcontracting by Respondent, or no actual or constructive knowledge of any part of it until the end of September 1975 . . ..

Several circuits, including this one, have recognized that the six month statute of limitations does not start to run until the injured party knows or should have known that his statutory rights were violated. *Metromedia, Inc. v. NLRB,* 586 F.2d 1182

---

**6.** The company has argued that they were prejudiced because General Counsel was allowed to introduce a novel theory of law (fraudulent concealment) after resting his case. They contend that the question of fraudulent concealment was never litigated. However, the facts of this case show little merit to this argument. The company had on December 30, 1975 requested information relating to all subcontracts during the previous two years. The company refused to furnish this information for the period prior to September 22, 1975, when the subcontracting was first discovered. A subpoena was served immediately prior to the trial requesting this information. It was taken up with the court prior to offering testimony. The Administrative Law Judge indicated he would like the parties to agree on what materials were really necessary in order to try the case and thus dispense with the subpoena altogether. General Counsel specified certain information regarding hitch subcontracts that had been let from January 1, 1974 to present. Company counsel agreed such information would be supplied and the NLRB agreed the subpoena would be withdrawn. Later during the hearing, however, counsel for the company indicated that he did not feel an agreement had been reached as to this material and requested the court to rule on the subpoena. The court ruled the subpoena must be complied with in accordance with the previous agreement of the parties. The hearing was recessed on June 8, 1976. The material in the form of a letter was received by General Counsel on June 21, 1976. The hearing was resumed on July 7. The letter was introduced by General Counsel as an exhibit and he rested. During the direct examination of the first witness for respondent, a discussion ensued at which time General Counsel stated:

We have heard testimony and General Counsel's Exhibit No. 11 shows one sub contract involving hitch work let after July 1, 1975. I had intended to wait until I made a motion as to dates, names, et cetera, but I think that to make sure that Mr. Meehan and the respondent are aware of General Counsel's position prior to proceeding with this case, I would like to move now that Paragraph 8 of the amended complaint be amended to substitute July 1, 1974 where Paragraph 8 now reads July 1, 1975 so that the pleadings will allege

that since on or about July 1, 1974 respondent has failed and refused and continues to refuse and fail to bargain collectively and in good faith with the charging party as the exclusive bargaining representative of all the employees in the unit described above in Paragraph 5 by sub contracting unilaterally and without prior notice to and bargaining with the charging party bargaining unit production work and by failing and refusing to negotiate and bargain with the charging party concerning the effects of said sub contracting of production work on the employees in the unit described above in Paragraph 5.

Joint Appendix at 210.

General Counsel could not at the time support his theory with citation to case law although he indicated that if a strict reading of 10(b) were used, a company might conceal its subcontracting for over six months and circumvent the act. The Administrative Law Judge was quick to pick up the fraudulent concealment doctrine, stating:

Judge Plaine: This is something like the theory where the person allegedly defrauded is not regarded to be barred until he has had the opportunity to find out.

Mr. Stoll: That is exactly the theory I am suggesting.

Joint Appendix at 218.

The Administrative Law Judge informed the parties that he would reserve ruling on the question of amendment but that they should each go ahead and present evidence. The Administrative Law Judge noted that:

It is not taking [company counsel] into an area that you haven't already covered. It is not requiring you to find anything else different other than a legal argument that no matter what is shown, it just doesn't count, it is barred, so, it seems to me that we could proceed without ruling against the motion or for the motion and leaving the legal issue to be decided in connection with the factual showings so that it has a realistic meaning.

Joint Appendix at 219. The company then introduced evidence that tended to show that delivery of the subcontracted goods was made openly and was not concealed. There is no indication of how the company was prejudiced by proceeding in the manner above indicated.

(8th Cir. 1978); *NLRB v. Allied Products Corp., Richard Bros. Div.*, 548 F.2d 644, 650 (6th Cir. 1977); *Wisconsin River Valley Dist. Council v. NLRB*, 532 F.2d 47, 53 (7th Cir. 1976); *NLRB v. Shawnee Industries, Inc.*, 333 F.2d 221, 224 (10th Cir. 1964).

The NLRB specifically agreed with the Administrative Law Judge's determination in this case that the 10(b) statute was tolled, stating in a footnote:

> The Employer is estopped from asserting a 10(b) defense, because its fraudulent concealment of vital information from the Union caused the latter to sleep while its opportunity to seek a legal remedy was slipping away. We cannot permit the Employer to benefit from the specific unfair labor practice which the Act explicitly empowers us to remedy. *Don Burgess Construction Corporation d/b/a Burgess Construction*, 227 NLRB No. 119 (1977); *Avila Group, Inc.*, 218 NLRB 633, 639 (1975).

In *Don Burgess* the company shifted work from union to nonunion employees while assuring the union that it did not intend to employ any carpenters. The NLRB held that in such a case both the charge and the remedy extended beyond the six month statute of limitations period. Similarly, the doctrine of fraudulent concealment was adopted in *International Ladies Garment Workers Union, AFL–CIO v. NLRB*, 150 U.S.App.D.C. 71, 463 F.2d 907 (1972), where the company told the union it was going out of business but in fact was moving the business to another state. Judge J. Skelly Wright, writing for the court, found there was no lack of diligence on the part of the union in discovering the fraud despite the fact that a considerable time period had elapsed. Not only was the statute tolled as to the filing of the charges, but back pay was allowed by the Circuit Court of Appeals to the date when the violation first occurred.

We believe the amendment of the complaint was appropriate in this case. There is substantial support for the finding that the union did not learn about the subcontracting until the end of September. When a union agent was apprised of the subcontracting, he took immediate action. The charge was filed well within six months of the union's learning of the subcontracting. In light of the facts, we do not believe the union exhibited any lack of diligence in discovering the subcontracting. The union was misled and deceived by the company. The company's negotiation chairman stated during the course of bargaining negotiations for the 1972–75 contract that no side letter concerning subcontracting would be necessary since the company had a statutory duty to bargain about subcontracting. We have in Section I found such a duty. The union, relying on this statement and the company's past history of notifying the union prior to subcontracting maintenance work, was undoubtedly lulled into a false sense of security. It is not surprising it did not discover the subcontracted work earlier even though deliveries were made by subcontractors to a building next to the hitch area. When the union began experiencing heavy lay-offs in December of 1974 and March of 1975, the union agent inquired as to the reason and was told by the hitch department superintendent that hitch sales were down. The superintendent claimed not to have any knowledge of the subcontracting until a later date. If he was not aware of the subcontracting of work from his own department, it is hard to see how the union should have been aware of the same. The statements of this company official gave the union no reason to investigate further or to send members to other buildings looking for evidence of subcontracted work. If the statute is not held to be tolled under these facts, the company will be allowed to benefit from its own unfair practices.

## III. FAILURE TO SUPPLY UNION WITH REQUESTED INFORMATION

 There is no question that an employer must "provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495

(1967); *NLRB v. Western Electric, Inc.*, 559 F.2d 1131 (8th Cir. 1977); *NLRB v. Twin City Lines, Inc.*, 425 F.2d 164, 167 (8th Cir. 1970). This duty extends beyond the period of contract negotiations. *Acme, supra.* The information must be relevant and reasonably necessary to the union's role as bargaining agent during the administration of a collective bargaining agreement. *Western Electric, supra; Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61, 68 (3d Cir. 1965). The information requested by the union relating to subcontracting, which the Administrative Law Judge ordered the company to supply, fell within this category. Without this information the union had no idea of the frequency of subcontracting, the amount and type of work involved, and the effect it might have had on the bargaining unit. The information was needed to pursue any claim that the company had a duty to bargain with the union prior to subcontracting out work.

■ The Administrative Law Judge also ordered the company to supply a handwriting analysis of an employee who was discharged for falsifying two sickness and accident claims. The union was furnished with copies of the two allegedly false claims and copies of the checks issued to the employee. The company had paid the cost of having the analysis made, and clearly felt the union should bear its own expense.[7] The company indicated a willingness to trade handwriting analysis if the union had their own.

Most appellate cases involve a failure to supply information which was readily accessible to the company and which might have been difficult, if not possible, for the union to obtain otherwise. *General Electric Co. v. NLRB*, 466 F.2d 1177 (6th Cir. 1972) (wage data); *Anaconda Wire and Cable Co. v. NLRB*, 444 F.2d 1028 (7th Cir. 1971) (incentive plans); *NLRB v. Northwestern Pub-*

*lishing Co.*, 343 F.2d 521 (7th Cir. 1965) (wage data). Unlike *Detroit Edison, supra,* and *NLRB v. Frontier Homes Corp.*, 371 F.2d 974 (8th Cir. 1967), both of which required disclosure, there was nothing particularly confidential about the material requested by the union. The result of the analysis was apparent from the fact the company decided to discharge the employee. The union was in the position of having to make a decision within ten days as to whether or not it was going to arbitrate the claim on behalf of the employee. Due to the limited time which the union had to make its decision, and the serious consequences of the charges, we conclude that the handwriting analysis was relevant and reasonably necessary to the union's decision of whether to arbitrate.

## IV. THE REMEDY

■ The company contends that the Board's order is too broad, is excessive and unrealistic and not in keeping with the Act's remedial purpose. The Board's remedy may be set aside only upon a showing that it has abused its broad discretion. *NLRB v. Drapery Manufacturing Co.*, 425 F.2d 1026, 1028–29 (8th Cir. 1970). We believe the Board's remedy here is within the confines of the Act. The reinstitution of a subcontracted operation has been approved in cases such as *Fibreboard, supra,* and *NLRB v. Jackson Farmers, Inc.*, 457 F.2d 516 (10th Cir. 1972). The order in this case is limited to requiring resumption of the hitch department only to the extent that there are customer orders or the company intends to stockpile trailer hitches. The NLRB has admitted in its brief at note 26 that not all of the employees lost their jobs due to the subcontracting and that the determination of which employees are entitled to back pay is appropriate for litigation during the back pay proceedings.[8] We are

---

7. There was some indication in the record that an analysis might cost as much as $400 to $500.

8. Note 26 of the Board's brief reads in part:
 In accordance with long established policies, the Board has not attempted to determine the

*amount* of the Company's financial liability and will not do so until the *fact* of that liability has been judicially confirmed. The Board did determine that the subcontracting necessarily resulted in losses to *some* employees, and hence, contrary to the Company, it is not entitled to relitigate this particu-

in agreement that in computing the awards the Board will have to take into account factors such as the amount of work subcontracted, how much work it would have provided, and which employees would have been laid off first when the subcontracting work began to run out. Section II of this opinion cites cases in support of allowing back pay beyond the 10(b) period of limitations. We reject the company's argument that the back pay awards should be limited to the 10(b) period.

The Board's order will be enforced.

lar issue. However, the Board also recognized that many hitch production jobs were lost as the result of factors which were not attributable to the Company's unfair labor practice. Determining the identity of of [sic] those specific employees who would have remained on the job longer, but for the subcontracting, is a matter appropriate for litigation in the backpay proceedings, and in such proceedings the Company will also have the opportunity to urge the other defenses—such as those relating to the unavailability of the employees during the strike—which it believes ought to mitigate its backpay liability. It should be noted that a backpay order is not invalid because the nature of the employer's violation makes difficult ascertainment of the exact amount of backpay due. *See American Fire Apparatus Co. v. N. L. R. B.*, 380 F.2d 1005, 1006 (C.A.8, 1967).